**Dianne WIEGE, Plaintiff and Appellee,**

v.

**Lawrence WIEGE, Defendant and Appellant.**

**Civ. No. 930287.**

Supreme Court of North Dakota.

June 28, 1994.

Mahoney & Mahoney, Center, for plaintiff and appellee; argued by Ann Mahoney.

Wheeler Wolf, Bismarck, for defendant and appellant; argued by Orell D. Schmitz.

MESCHKE, Justice.

Larry Wiege appeals from a divorce judgment dividing property and awarding spousal support to Dianne Wiege. We affirm.

Larry and Dianne were married in 1971 and have two adult children. Larry also adopted Dianne's daughter from a prior marriage. The marital estate was divided equally, with Larry keeping the farm and Dianne receiving $33,000 over ten years at 7% interest with the interest offset by spousal support paid. Dianne requested monthly spousal support of $1,300 for five years and $500 for an additional four years. Larry made four alternative proposals combining support with property distribution. The trial court rejected these suggestions. Instead, it ordered Larry to pay monthly support of $1,000 for six years or until Dianne received a four-year college degree, whichever is earlier, and then $300 until she dies.

Dianne was 46 years old and Larry was 47 at the divorce. Both Larry and Dianne are relatively healthy and each has a high school education, Larry by diploma and Dianne by GED. Larry has worked for 18 years at a telephone cooperative and currently earns $18.90 an hour. His employment benefits include pension contributions and medical insurance. He also receives monthly military disability payments and raises a few cattle on the farm. Dianne had several low-paying jobs during the marriage. She has worked since August 1992 at a Bismarck store and currently earns $4.90 an hour. Her benefits include pension contributions after eight years with the company and partial payment of medical insurance premiums. Dianne cannot earn more at her current job without a college degree and must work full-time to receive medical benefits.

The trial court found that Dianne "will be disadvantaged by this divorce." It concluded that Dianne needed $700 monthly, in addition to her current wages of $530 and property distribution installments of $250, to pay her necessary living expenses of $1,500 while attending college. It also concluded that even if Dianne earned a college degree, permanent monthly support of $300 would be "equitable ... to offset the permanent economic disadvantage suffered by Mrs. Wiege as a consequence of the time she has spent functioning in the home."

Larry disagrees with the trial court's finding that Dianne was disadvantaged by the divorce and needs rehabilitative support. He also argues that "[o]nly in a situation where a party is incapable of rehabilitation should permanent spousal support be awarded." Dianne argues that rehabilitative and permanent spousal support are both appropriate in this case. We agree.

When granting a divorce, a trial court may "compel either of the parties ... to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just, having regard to the circumstances of the parties respectively." NDCC 14–05–24. Spousal support determinations are findings of fact that will not be reversed on appeal unless clearly erroneous. *LaVoi v. LaVoi*, 505 N.W.2d 384, 386 (N.D.1993). Detailed findings of fact are helpful but not required if the trial court's reasons are fairly discernible by deduction or inference. *Pfliger v. Pfliger*, 461 N.W.2d 432, 436 (N.D.1990). Here, the trial court properly concluded that both rehabilitative and permanent support were necessary to equitably share the reduction in Dianne's standard of living caused by the divorce.

■ Both Dianne and Larry view the trial court's decision as awarding monthly rehabilitative support of $700 for up to six years and permanent support of $300. Regardless of the form used, spousal support should be awarded only after consideration of the *Ruff–Fischer* factors. *LaVoi v. LaVoi,* 505 N.W.2d at 386 (permanent); *McAdoo v. McAdoo,* 492 N.W.2d 66, 71 (N.D.1992) (rehabilitative). These factors include:

> [T]he respective ages of the parties, their earning ability, the duration of the marriage and conduct of the parties during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at the time, its income-producing capacity, if any, whether accumulated before or after the marriage, and such other matters as may be material.

*Weir v. Weir,* 374 N.W.2d 858, 862 (N.D. 1985). The distribution of marital property should also be considered when "setting the amount of support for a disadvantaged spouse." *Pfliger,* 461 N.W.2d at 436. Other matters can include retirement savings or pensions, *Roen v. Roen,* 438 N.W.2d 170, 172 (N.D.1989), the liquidity or income-producing nature of the property distributed to the disadvantaged spouse *Heley v. Heley,* 506 N.W.2d 715, 720 (N.D.1993), and whether the disadvantaged spouse will have to use up that property to live. *Id.*

■ A spouse must be disadvantaged as a result of the divorce for rehabilitation or maintenance to be appropriate. *Weir,* 374 N.W.2d at 862. We prefer temporary rehabilitative support to remedy this disadvantage, and indefinite permanent support is appropriate only if a spouse "cannot be adequately restored to independent economic status." *Heley,* 506 N.W.2d at 720. Therefore, a trial court should consider rehabilitative support first because it may eliminate the need for permanent support.

■ The purpose of rehabilitative support is to provide a disadvantaged spouse the opportunity to become self-supporting through additional training, education, or experience. *LaVoi,* 505 N.W.2d at 386, *citing*

*Rustand v. Rustand,* 379 N.W.2d 806, 807 (N.D.1986). A spouse's need for rehabilitation is not limited to the "prevention of destitution," but can also be based on their standard of living before the divorce. *Wahlberg v. Wahlberg,* 479 N.W.2d 143, 145 (N.D.1992). Rehabilitative support can "balanc[e] the burdens created by the separation" if the parties do not have enough income to maintain the same standard of living apart as they enjoyed together. *Wahlberg, id., citing Weir,* 374 N.W.2d at 864. As we indicated in *Weir,* 374 N.W.2d at 864–65, Larry's ability to pay and Dianne's potential for rehabilitation should also be considered.

■ Dianne is clearly disadvantaged by this divorce. The trial court found: "She has had limited opportunity to advance her education or her employment and earning skills because of the burden of her homemaking duties." Dianne's current wages are not sufficient to pay her monthly living expenses, much less maintain her previous standard of living. By comparison, in addition to his farm income and disability payments, Larry's hourly wage is almost four times higher than Dianne's. As in *Roen,* 438 N.W.2d at 172, this substantial disparity in earning abilities justifies rehabilitative support for Dianne.

■ Assuming rehabilitative support was properly awarded, Larry argues that "[i]mplicit in this decision is that Dian[n]e will be rehabilitated after the 72–month period." He argues that permanent support is not appropriate because Dianne "would at that point be adequately restored to an independent economic status." We disagree.

■ Permanent support is not limited to a spouse who is incapable of *any* rehabilitation, as Larry suggests, but may also be awarded to a spouse incapable of *adequate* rehabilitation or self-support. *LaVoi,* 505 N.W.2d at 386; *see also Heley,* 506 N.W.2d at 720 (support appropriate until spouse is rehabilitated and "possibly at a reduced rate for an indefinite term"). Paraphrasing our explanation in *Weir,*

> ... the fact that [Dianne] is capable of rehabilitation should not in itself deprive her of reasonable spousal support in light

of the fact that she is likely to have a much lower income producing capacity than [Larry], which earning capacity she aided [Larry] in obtaining through her contribution as the homemaker.

374 N.W.2d at 864; *compare McAdoo*, 492 N.W.2d at 71 (age of spouse, short duration of marriage, and potential for adequate rehabilitation outweigh slight disadvantage from divorce). Even with a college degree in six years, Dianne "is now at an age at which" it is unlikely that she can "attain an earning capacity comparable to that of her husband" or sufficient to maintain her previous standard of living. *LaVoi*, 505 N.W.2d at 386 (quotation omitted). The trial court's award of permanent support, combined with the rehabilitative support, equitably shares "the overall reduction in the parties' separate standards of living" and is not clearly erroneous. *Id.* at 387.

Larry does not argue that the total amount of spousal support in this case is excessive, but complains that the trial court had no standards for combining both types of support. However, there is no magic formula for determining how much or what type of support should be awarded. Even Larry's attorney admitted at oral argument that guidelines similar to those for child support could not be adopted for spousal support. Although "treated differently," *Rustand*, 379 N.W.2d at 807, rehabilitative and permanent support are both awarded after consideration of the *Ruff–Fischer* factors to either maintain the parties' pre-divorce standard of living or equitably share the burden caused by the divorce. *See LaVoi*, 505 N.W.2d at 387. Because both forms of support are based on the same factors and serve the same purposes, we believe more specific guidelines are impossible and unnecessary.

Larry also argues that the trial court erroneously refused to terminate Dianne's support if she remarries. Unless there are extraordinary circumstances, spousal support will terminate when the disadvantaged spouse remarries. *Rustand*, 379 N.W.2d at 807. "Therefore, it is preferable for a trial court to spell out preordained contingency limits of spousal support in the divorce decree." *Roen*, 438 N.W.2d at 173.

There was no finding of extraordinary circumstances in this case, and it is puzzling why a trial court would invite further litigation by awarding support for life. However, the duration of Dianne's support is not clearly erroneous because it can be modified under NDCC 14–05–24 if she remarries.

Dianne requests attorneys fees for this appeal, either because it is frivolous or because Larry "has the greater ability to pay said fees." *See* NDCC 14–05–23. Although we affirm the trial court's decision, Larry's appeal is not frivolous. We have concurrent authority with the trial court to award attorney's fees on appeal. *See Bader v. Bader*, 448 N.W.2d 187, 190 (N.D.1989); *Roen*, 438 N.W.2d at 174. However, the trial court is in a better position to determine whether Larry should pay Dianne's attorney's fees. *Id.*

Therefore, we affirm the divorce judgment and remand for consideration of attorney's fees on appeal.

VANDE WALLE, C.J., and SANDSTROM and NEUMANN, JJ., concur.

LEVINE, Justice, concurring.

I write specially to emphasize the limited context of our oft-stated "preference" for temporary rehabilitative support and the inequities that preference will visit upon the recipient of inadequate temporary rehabilitative support, if misunderstood. I also challenge the logic of our precedent that calls for automatic termination of support upon the recipient's remarriage.

As the majority notes, rehabilitative support is varied in purpose. It may be used as a means to restore an economically disadvantaged spouse to independent economic status. *See Heley v. Heley*, 506 N.W.2d 715, 719–20 (N.D.1993). It also may be used to equalize the burden of the divorce, *Wahlberg v. Wahlberg*, 479 N.W.2d 143, 145 (N.D.1992), by increasing the earning capacity of the disadvantaged spouse. *See Roen v. Roen*, 438 N.W.2d 170, 172 (N.D.1989). Notwithstanding our "preference" for it, and our heavy reliance on it, temporary rehabilitative support may not enable an economically disad-

vantaged spouse to achieve an earning capacity that provides a pre-divorce standard of living or an equitable share in the reduction of that standard of living. While it may be a necessary means to the goal of economic rehabilitation, temporary rehabilitative support is often not sufficient, by itself, to obtain that end. Our "preference" for it, therefore, is merely a means of instructing that an award of temporary rehabilitative support should be a first step in the trial court's exercise of discretion to achieve an equitable dissolution of the marriage.

Larry's earning capacity of four times more than Dianne's is typical of the general disparity in earning capacities between divorcing men and women. *See Beals v. Beals,* 517 N.W.2d 413, 418 (N.D.1994) (Levine, J., concurring). Temporary rehabilitative support that enables a spouse like Dianne to obtain education or training is unlikely to achieve the parity necessary for Dianne to maintain her prior standard of living or to bear no greater reduction than Larry in her post-divorce standard of living. A remedy for this permanent disparity in earning capacity and the inequitable burdens the disparity breeds is permanent support.

Permanent support is a means of compensating a spouse for the permanent economic disability caused by the husband/wife decision for the one to forgo career opportunities and advancement as the other enhances earning capacity. *See* Marcia O'Kelly, Entitlements to Spousal Support After Divorce, 61 N.D.L.Rev. 225, 246–50 (1985); *see also LaVoi v. LaVoi,* 505 N.W.2d 384, 386–87 (N.D.1993); *Bullock v. Bullock,* 354 N.W.2d 904, 911 (N.D.1984); *Nastrom v. Nastrom,* 284 N.W.2d 576, 581–82 (N.D.1979). That mutual decision is of benefit to both partners during the life of the marriage but dissolution of the marriage is a different story. Permanent support is the price to be paid for the earlier mutual decision about the role to be played by each marital partner when, in fact, the economically disadvantaged partner cannot obtain, after training and reasonable time, the income necessary to live a life comparable to the one prior to divorce or comparable to the higher earner's post-divorce reduced standard of living. *See Heley,*

*supra* at 720; *Roen, supra* at 172; *Weir v. Weir,* 374 N.W.2d 858, 863–64 (N.D.1985).

While there may be no ready formula for awarding spousal support, it is essential that temporary rehabilitative support and permanent support are understood to be two distinct remedies with distinct purposes. The need for rehabilitative support is easier to comprehend—a fairly immediate fix for a fairly obvious problem. However, it may be only a partial fix to accomplish economic rehabilitation of the disadvantaged spouse. Permanent support, often misunderstood or overlooked, is another part of the arsenal available to restore economic equity to a partner of a failed marital enterprise.

If support, whether rehabilitative or permanent, or both, is viewed properly as compensation for lost career opportunities and advancement, then a recipient's remarriage should not automatically terminate that support. O'Kelly, *supra* at 258–60. While lack of good faith effort to achieve economic rehabilitation is a relevant factor in deciding whether support should be terminated, remarriage alone is not. *Id.* at 259; *see also Bauer v. Bauer,* 356 N.W.2d 897, 899–900 (N.D.1984). The argument is that support should not automatically terminate upon remarriage of the recipient if "the underdeveloped earning capacity of the recipient could not be or was not yet rehabilitated." O'Kelly, *supra* at 261 n. 151. In other words, a deal is a deal and when the marital enterprise dissolves and the debt (*i.e.* support) and assets are allocated between the parties, the debtor's obligation to repay those debts should continue whether or not the creditor forms a new enterprise.

In omitting a remarriage termination provision, the trial judge may well have determined that all of the support was owed by Larry to rehabilitate and compensate Dianne, contingent not upon her remaining single, but upon her exercise of good faith effort to seek rehabilitation. Foreseeing no way Dianne would ever earn enough to maintain even a reduced standard of living comparable to Larry's, the trial court ordered Larry to pay permanent support to compensate Dianne for her economic disability arising from the role she played during her marriage

to Larry. Whether or not Dianne remarries, she is entitled to repayment of that debt, unless at the time of her remarriage, she has achieved full economic rehabilitation, that is, an income that approximates the one Larry achieved during the marriage.

Our modern view of marriage is that it is a partnership with each party making valuable contributions to the enterprise. *Erickson v. Erickson,* 384 N.W.2d 659, 663 (N.D.1986) (Levine, J., concurring). The common law duty of the husband to support the wife has been supplanted by the mutual duty of the husband and wife to support each other. *See* NDCC § 14–07–03. As Professor O'Kelly observes, when support was awarded to wives as a continuation of the duty to support and maintain wives during marriage, it made good sense to terminate the duty when the wife remarried and the new husband assumed the duty of support. O'Kelly, *supra* at 235–36. Today, however, post-divorce support is not a continuation of a duty to support. Instead, it is compensation for lost opportunities and advancement. As such, it remains a cost of the failed marriage and a debt of the one who benefited from the mutual decision to enhance only one career. Having nothing to do with the recipient's new partner and everything to do with the recipient's former partner and former partnership, it should continue until economic parity is obtained or, if such parity is unattainable, for the duration established in the judgment.